**Jack O. BLACK, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**No. 83–2327.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1984.

Decided May 21, 1985.

Gordon P. MacDougall, Washington, D.C., for petitioner.

Charles A. Stark, Atty. I.C.C., Washington D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., and Barry Grossman and Nancy C. Garrison, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents. Robert S. Burk, Acting Gen. Counsel, and Henri F. Rush, Acting Deputy Gen. Counsel, I.C.C., Washington, D.C., were also on the supplemental brief for respondent, I.C.C.

Richard A. Allen, Washington, D.C., for intervenor, Indiana Hi-Rail Corp.

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

Before EDWARDS and BORK, Circuit Judges, and OBERDORFER,* District Judge.

Opinion for the Court filed by District Judge OBERDORFER.

OBERDORFER, District Judge:

This is a petition to review a decision of the Interstate Commerce Commission exempting the Indiana Hi-Rail Corporation ("IHR")[1] from all requirements of the Interstate Commerce Act with respect to IHR's acquisition and operation of a 22.21 mile railroad line between New Castle and Rushville, Indiana (the "Rushville line"). *Indiana Hi-Rail Corporation—Exemption from 49 U.S.C. Subtitle IV—Operations between New Castle and Rushville, IN*, Finance Docket No. 30169 (July 11, 1983). The Rushville line had previously been owned and operated by Norfolk and Western Railway Company ("N & W"). In addition to granting the general exemption, the decision further announced that the Commission would not impose any employee protective conditions on IHR with respect to IHR's takeover and operation of the line.

Petitioner, Jack O. Black, Indiana Legislative Director of the United Transportation Union ("UTU"), challenges various aspects of the Commission's decision. First, petitioner argues that IHR's takeover of the railway line was a "consolidation," "merger," or "acquisition of control" pursuant to 49 U.S.C. § 11343 (1982). In such transactions, the imposition of employee protective conditions is mandatory under 49 U.S.C. § 11347 (1982). Second, petitioner contends that the Commission's further decision to grant IHR a general exemption from Commission regulation under the Interstate Commerce Act was arbitrary and capricious. Finally, UTU argues that during the proceedings before the Commission, the Commission improperly treated a petition for reconsideration filed by UTU as subject to the criteria for "revocation" of

1. Indiana Hi-Rail Corporation is an intervening respondent in this action.

an exemption under 49 U.S.C. § 10505(d) (1982), and thereby incorrectly placed the burden of proof as to that petition on UTU.

For the reasons stated below, the Commission's determination that the imposition of employee protective conditions was not mandatory is affirmed. The Commission's discretionary refusal to impose such conditions on IHR, and its grant to IHR of a general exemption from Commission regulation, are similarly affirmed. Finally, even if the Commission erred in its characterization of UTU's petition for reconsideration, it does not appear in this case that any "substantial rights" of UTU were thereby affected. 28 U.S.C. § 2111 (1982).

I.

The Rushville line has already been the object of considerable agency and judicial attention. In December of 1977, N & W applied to the Commission for authority to abandon the line pursuant to 49 U.S.C. § 10903 (1982),[2] even though the line had been a profitable one serving several shippers. See J.A. 2. After an initial denial by an administrative law judge, the Commission approved the abandonment in 1980. *Norfolk & W. Ry. Co.—Abandonment,* 363 I.C.C. 115 (1980). Subsequently, the United States Court of Appeals for the Seventh Circuit set aside the approval and remanded the case to the Commission. *International Minerals & Chemical Corp. v. Interstate Commerce Commission,* 656 F.2d

251 (7th Cir.1981). On remand, the Commission—in a decision served on November 4, 1982—again approved N & W's application for abandonment of the Rushville line. *Norfolk and Western Railway Company—Abandonment between New Castle and Rushville, in Henry and Rush Counties, Indiana,* Docket No. AB–10 (Sub-No. 11) (Nov. 4, 1982).

In the meantime, IHR, an entity first organized in 1980,[3] had acquired from Conrail a six-mile railroad line between Beesons and Connersville, Indiana (the "Connersville line"), J.A. 3, within the same general region as the Rushville line. *See* Joint Brief for the Interstate Commerce Commission and the United States of America at 12a (map of Rushville and Connersville lines) [hereinafter cited as "Respondents' Brief"]. IHR's authority to acquire the Connersville line was granted by the Commission on November 16, 1981, under 49 U.S.C. § 10910 (1982), the Staggers Rail Act "feeder line" development program. *Indiana Hi-Rail Corp.—Feeder Line Acquisition,* 366 I.C.C. 42 (1981).[4] At the time of acquisition, IHR elected to invoke an aspect of the feeder line development legislation that allowed it—as a participant in the feeder development program—to take a full exemption from all of the provisions of Title 49 (except those relating to joint rates) with respect to its operation of the Connersville line, *see*

---

**2.** Despite the recodification of 49 U.S.C. § 10903 (1982) (formerly 49 U.S.C. § 1a(1), (4) (1976 ed.)) in 1978, *see* Act of October 17, 1978, Pub.L. No. 95–473, 92 Stat. 1337, 1403, the provision has not been substantively amended in any materially relevant fashion since the time of N & W's first application to abandon the Rushville line. Section 10903 provides in pertinent part that:

    (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under ... chapter 105 of this title may—

      (1) abandon any part of its railroad lines; or

      (2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity

require or permit the abandonment or discontinuance.

**3.** IHR represents that it was organized "principally to acquire and operate 'feeder lines' and other branch lines that had been abandoned or were threatened with abandonment." Brief for Intervenor Indiana Hi-Rail Corporation at 6 [hereinafter cited as "Intervenor's Brief"].

**4.** The "feeder line" development program, enacted in 1980 and codified at 49 U.S.C. § 10910 (1982), is aimed at facilitating the acquisition of certain underutilized "feeder lines" by entities deemed by the Commission to be "financially responsible." 49 U.S.C. § 10910; *see* H.R.Rep. 1035, 96th Cong., 2d Sess. 71–72 (1980), *reprinted at* 1980 U.S.Code Cong. & Ad.News at 3978, 4016–17.

§ 10910(g)(1).[5] J.A. 3. IHR continues to operate the Connersville line as a feeder line effectively exempt from ICC regulation. *See* J.A. 3.

At the same time that IHR was acquiring the Connersville line, it also revealed a strong interest in acquiring the Rushville line as well. In the Commission proceedings on IHR's application to acquire the Connersville line, indeed, IHR actually announced that it had "negotiated an agreement with N & W to acquire" the Rushville line. *Indiana Hi-Rail Corp.—Feeder Line Acquisition, supra,* 366 I.C.C. at 46. It appears that in fact no final sale was actually consummated, but contacts between N & W and IHR continued. When the Commission subsequently considered the Rushville line abandonment application on remand from the Seventh Circuit Court of Appeals, IHR intervened and filed a brief urging that the Commission's processing of the application be expedited.[6] Then, soon after the Commission's November 4, 1982 re-approval of N & W's abandonment application, IHR—on November 12, 1982—made an offer to purchase the Rushville line pursuant to 49 U.S.C. § 10905(c) (1982). *See* Petitioner's Brief at 14a.[7] When it then appeared that N & W and IHR would be unable to agree on a purchase price, they requested that the Commission establish a price for the line pursuant to 49 U.S.C. 10905(e). *Id.* The Commission complied, announcing a price on February 11, 1983. IHR, however, rejected even the Commission's suggested price, and on February 18, 1983, IHR formally withdrew its § 10905(c) offer to purchase the line. *Id.*

Upon the withdrawal of IHR's purchase offer, the Commission returned to its handling of the Rushville line as an abandonment matter.[8] On March 3, 1983, the Commission issued to N & W an abandonment certificate with respect to the line. *Id.* at 14a–15a.[9] N & W gave public notice on April 1, 1983, that it would cease service on the Rushville line effective April 12, 1983. *See* Petitioner's Brief at 6; Respondent's Brief at 36 n. 25, 14a–16a. On April 12, 1983, N & W in fact cancelled its tariffs and claims to have ceased service on the Rushville line. J.A. 3, 30. On April 20,

---

5. Title 49 U.S.C. § 10910(g)(1) (1982) provides that:

> Any person operating a railroad line acquired under this section may elect to be exempt from any of the provisions of this title, except that such a person may not be exempt from the provisions of chapter 107 of this title with respect to transportation under a joint rate.

6. IHR presented no testimony at the subsequent Commission hearing on whether to grant the abandonment application. Brief for Petitioner at 5, 2a [hereinafter cited as "Petitioner's Brief"].

7. Title 49 U.S.C. § 10905 (1982) sets up a procedure whereby a "financially responsible" entity may—by making an offer of subsidy or purchase—seek to ensure "continued rail service" on a line for which an application for abandonment or discontinuance has been approved but for which a certificate of convenience and necessity thereto has not yet been issued. *See* 49 U.S.C. § 10905. *See generally Hayfield Northern R.R. v. Chicago & North Western Transp. Co.,* — U.S. —, —, 104 S.Ct. 2610, 2615–16, 81 L.Ed.2d 527 (1984).

8. Petitioner's Brief at 14a–15a; *see* 49 U.S.C. § 10905(f)(2).

9. Title 49 U.S.C. § 10903(b)(2) (1982) (formerly 49 U.S.C. § 1a(1), (4) (1976 ed.)), requires that

> Each certificate [of abandonment or discontinuance pursuant to 49 U.S.C. § 10903] shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title....

Accordingly, the March 3, 1983 abandonment certificate stipulated that if N & W were to exercise the authority granted by the certificate, N & W would be required to fulfill "the conditions for the protection of employees described in *Oregon Short Line R. Co.—Abandonment Goshen,* 360 I.C.C. [91] (1979)." Brief for Petitioner at 15a. Employee protection requirements, thus, have already been imposed on *N & W* in connection with the abandonment of the Rushville line. In the petition before this Court, by contrast, UTU seeks to have employee protection requirements imposed upon *IHR,* in connection with IHR's corresponding takeover of the line. In fact, IHR asserts that, even in the absence of employee protection requirements, it "offered employment to a number of former N & W employees (one of whom accepted but subsequently quit), and has operated from the beginning under a collective bargaining agreement with the UTU covering all of IHR's hourly employees." Intervenor's Brief at 32.

1983, N & W filed a letter with the Commission stating that on April 12, 1983, it had "discontinued" service on the line. J.A. 26, 40.

Yet while N & W was thus terminating its operations on the Rushville line, public negotiations to sell the line to IHR resumed. Respondents and intervenor assert that on April 8, 1983—the eve of the cessation of service—N & W notified IHR of its willingness to sell the Rushville line on new terms and also to lease the line to IHR pending consummation of the sale. J.A. 3, 5, 9. Almost immediately, IHR and N & W made public an agreement on the sale of the line, *id.*, and IHR executed a lease with N & W on April 12, 1983, J.A. 41—the same day on which N & W ceased service on the line. On the following day, IHR applied to the Commission for a temporary exemption from ICC regulations so as to enable IHR to operate the line under lease pending consideration by the Commission of a petition for a permanent exemption with respect to IHR's operation of the line after the sale was consummated. J.A. 1–7.

On April 15, 1983, the ICC rendered a decision that granted the temporary exemption, and that allowed IHR to operate the line during the period of the lease without having to provide any employee protections in doing so. J.A. 8–11. Simultaneously, IHR filed tariffs, which became effective on April 20, 1983, with respect to its prospective operations on the Rushville line. The Commission represents—without contradiction by petitioner—that IHR's operations on the line commenced on April 20, 1983. *See* Respondents' Brief at 36–37 & n. 26, Addendum E.

Soon thereafter, on July 11, 1983, the ICC also granted IHR's petition for a permanent exemption, effective August 11, 1983. J.A. 54–60. Paralleling the pattern of the temporary exemption decision, the permanent exemption decision also imposed no labor protection requirements on IHR with respect to its operation of the line. J.A. 58–59.

The Commission's July 11, 1983 decision stated that "petitions for reconsideration must be filed by August 1, 1983." J.A. 59, 60. UTU filed such a petition with the Commission on August 1, 1983. J.A. 84. In the Commission's ruling on the petition, however, it announced that it would consider the petition according to the standard for "revocation" of an exemption, set out in 49 U.S.C. § 10505(d) (1982). J.A. 84–85. The ruling, served on October 26, 1983, denied the petition. Id. at 85, 89.

This appeal followed.

## II.

It is well established that the imposition of labor protective conditions on the acquiring entity is mandatory for any railway transaction that is a "consolidation," "merger," or "acquisition of control" pursuant to 49 U.S.C. § 11343. 49 U.S.C. § 11347; *see McGinness v. Interstate Commerce Commission*, 662 F.2d 853, 857 (D.C.Cir.1981).[10] The statute itself and the

---

10. Title 49 U.S.C. § 11343 (1982) (formerly 49 U.S.C. § 5(2)(a), (5), (6), (7), (11), (14) (1976 ed.)) provides, in pertinent part, that:

(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under ... chapter 105 of this title may be carried out only with the approval and authorization of the Commission:

(1) consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.

(2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.

(3) acquisition of control of a carrier by any number of carriers.

(4) acquisition of control of at least 2 carriers by a person that is not a carrier.

(5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.

(6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier. Title 49 U.S.C. § 11347 (1982) (formerly 49 U.S.C. § 5(2)(f) (1976 ed.)) provides that:

When a rail carrier is involved in a [section 11343 transaction], the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected

relevant cases indicate, however, that no "consolidation," "merger," or "acquisition of control" is present where the transaction is not one "involving" at least two carriers, 49 U.S.C. § 11343(a); *see id.* § 11343(a)(1)–(6); *In re Chicago, Milwaukee, St. P. & P. R.R.,* 658 F.2d 1149, 1169 (7th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *People of the State of Illinois v. United States,* 604 F.2d 519, 524–26 (7th Cir.1979), *cert. denied,* 455 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980), or where the transaction involves the takeover of a line that has been "abandoned" within the meaning of 49 U.S.C. § 10903, *see Okmulgee Northern Ry.—Abandonment,* 320 I.C.C. 637, 638–41 (1964). Instead, the acquisition of a line of railway in either of these circumstances is typically governed by 49 U.S.C. § 10901 (1982).[11] *See In re Chicago, Milwaukee, St. P. & P. R.R., supra,* 658 F.2d at 1169; *People of the State of Illinois v. United States, supra,* 604 F.2d at 524–25; *Okmulgee Northern Ry.—Abandonment, supra,* 320 I.C.C. at 638–41. Unlike transactions under 49 U.S.C. § 11343, where imposition of labor protective conditions is mandatory, the decision whether to impose such conditions on the acquiring entity in any transaction under 49 U.S.C. § 10901 falls within the Commission's discretionary authority. *See* 49 U.S.C. § 10901(c)(1)(A)(ii); *Railway Labor Executives' Ass'n v. United States,* 697 F.2d 285, 286 (10th Cir.1983); *Simmons v. Interstate Commerce Commission,* 697 F.2d 326, 340 (D.C.Cir.1982); *In re Chicago, Milwaukee, St. P. & P. R.R., supra,* 658 F.2d at 1169; *Okmulgee Northern Ry.—Abandonment, supra,* 320 I.C.C. at 645.[12] *Accord Interstate Commerce Commission v. Railway Labor Executives Ass'n,* 315 U.S. 373, 379–80, 62 S.Ct. 717, 721, 86 L.Ed. 904 (1942); *Prairie Trunk Railway—Acquisition and Operation,* 348 I.C.C. 832, 849 (1977). In response to petitioner's arguments to the contrary, the Commission maintains both that it properly treated the Rushville line as one that had indeed been "abandoned" by the time of its acquisition by IHR, and that, in any event, IHR was not a "carrier" within the meaning of § 11343 prior to the acquisition. For either reason, the Commission argues, it was under no mandatory obligation to impose labor protective conditions on IHR, and did not abuse its discretion in declining to do so in the circumstances here.

## A.

At oral argument, the emphasis of the presentation by counsel for the Commission

---

by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).

11. Title 49 U.S.C. § 10901 (1982) (formerly 49 U.S.C. § 1(18)(a), (b) (1976 ed.)) provides, in pertinent part, that:

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under ... chapter 105 of this title may—

(3) acquire or operate an extended or additional railroad line; ...

only if the Commission finds that the present or future public convenience and necessity require or permit the ... acquisition ... and operation of the railroad line.

12. Title 49 U.S.C. § 10901(c) (formerly 49 U.S.C. § 1(18)(a), (b) (1976 ed.)) provides, in pertinent part, that:

(1) If the Commission—

(A) finds public convenience and necessity, it may—

(i) approve the application as filed; or

(ii) approve the application with modifications *and require compliance with conditions* the Commission finds necessary in the public interest; or

(B) fails to find public convenience and necessity, it may deny the application.

(2) On approval, the Commission shall issue to the rail carrier a certificate describing the ... acquisition ... and operation approved by the Commission.

(Emphasis added).

was on the Commission's conclusion that the Rushville line had been "abandoned" by N & W before the acquisition by IHR. Notwithstanding counsel's argument, however, the fact remains that the decisions of the Commission at issue in this case addressed the "abandonment" question in only a cursory and conclusory fashion, without clearly specifying the criteria the Commission had applied or the facts it had considered in making the "abandonment" determination. *See* J.A. 8–10, 55, 58–59, 87.[13] Such a record poses serious difficulties for our review of the Commission's determination.

Commission precedent states that "A line is fully abandoned after a certificate of public convenience and necessity has been issued, and when operations have ceased, tariffs have been canceled and a letter has been filed with the Commission that the abandonment has been consummated." *Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions,* 363 I.C.C. 132, 135 n. 2 (1980), *aff'd, Simmons v. ICC, supra.* In the present case, though the Commission made no explicit review of N & W's compliance with these formal criteria, there is evidence in the record that would have supported a finding of compliance with at least three of these four requirements:

a) On March 3, 1983, the Commission issued a certificate of public convenience and necessity to N & W authorizing it to "abandon" the Rushville line. J.A. 8, 30, 55; Petitioner's Brief at 14a–15a.

b) Between April 12, 1983, and April 20, 1983, N & W ceased its operations on the line. J.A. 3, 8, 30.

c) On April 12, 1983, N & W cancelled its tariffs on the line. J.A. 3, 8, 30.

Petitioner, however, has raised legitimate concerns with respect to the fourth Commission criterion: the filing of a letter confirming that the abandonment of the line has been consummated. On April 20, 1983, N & W filed a letter with the Commission duly citing the Commission's March 3, 1983 abandonment order, but inconsistently reporting only that "operations" on the Rushville line had been "discontinued." J.A. 26, 40.[14] The Commission's own regulations make clear that the abandonment of a line and the discontinuance of rail service are distinct events requiring separate authorization by the Commission. *See* 49 C.F.R. §§ 1152.1–.28 (1984). The record, moreover, contains copies of letters filed in other Commission proceedings by N & W—an experienced railway operator—showing that N & W was fully capable of distinguishing between abandonment and discontinuance in providing formal notice of such events to the Commission. *See* Reply Brief at 4b–9b. In light of N & W's obvious expertise in railway regulation, this anomolous language in N & W's formal notice raises genuine questions as to whether the Commission's final "abandonment" criterion has been met. The Commission's decisions in this matter, however, made no reference to the N & W letter, and give no indication whether the Commission even considered this inconsistency. *See* J.A. 55, 58–59, 87.

Numerous federal courts, moreover, have stated in a related context that a determination as to whether there is an "abandonment" should involve a more searching and functional inquiry about the actual intent of the parties to the transac-

---

**13.** In the Commission's temporary exemption decision served April 18, 1983, for example, the Commission stated simply that "on March 3, 1983, Commission [sic] issued a certificate of abandonment to N & W. On April 12, 1983, N & W canceled its tariffs and ceased service on the line." J.A. 8. These comments were simply recited in an opening summary of events, and the decision contained no further analysis of any sort on the abandonment issue. In the permanent exemption decision served July 11, 1983, the Commission stated only that "[on]

March 3, 1983, we authorized NW to abandon the line. The abandonment was consummated on April 12, 1983." J.A. 55.

**14.** The April 20, 1983 letter consisted of a single sentence: "Pursuant to the Commission's order served March 3, 1983, this will advise that operations over N & W's line between Milepost 1.92 at New Castle, Indiana and Milepost 24.13 at Rushville were discontinued on April 12, 1983."

tion than the bare formalities addressed by the Commission here. As stated by the Eighth Circuit Court of Appeals, " '[a]bandonment' . . . is characterized by an *intention* of the carrier to cease permanently or indefinitely all transportation service on the relevant line." *Interstate Commerce Commission v. Chicago & North Western Transp. Co.*, 533 F.2d 1025, 1028 (8th Cir. 1976) (emphasis added). *See Mississippi Public Service Commission v. Interstate Commerce Commission*, 662 F.2d 314, 317 (5th Cir.1981); *Interstate Commerce Commission v. Maine Central R.R.*, 505 F.2d 590, 593–94 (2d Cir.1974); *Interstate Commerce Commission v. Chicago, R.I. & Pac. R.R.*, 501 F.2d 908, 911 (8th Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975); *Interstate Commerce Commission v. Baltimore & A. R.R.*, 398 F.Supp. 454, 462 (D.Md.1975), *aff'd*, 537 F.2d 77 (4th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976).[15] In *Interstate Commerce Commission v. Chicago, R.I. & Pac. R.R.*, *supra*, the Eighth Circuit Court of Appeals succinctly explained that "[f]actually, determination of the question revolves around the *intent* of the railroad. . . ." 501 F.2d at 911 (emphasis added).

Petitioner, also, raises the "intent" issue directly. Petitioner argues that N & W and IHR had "all along . . . planned to transfer" the Rushville line to IHR, Petitioner's Brief at 25, and that the only purpose of the abandonment process was to take the transaction out from under 49 U.S.C. 11343 and thus avoid the mandatory employee protection requirements that would thereby have applied. *See id.* at 25–26; J.A. 15–16. Although respondents contend that N & W and IHR finally succeeded in reaching agreement on an eventual sale only on the very eve of N & W's abandonment of the line, petitioner essentially argues that this "last minute" public agreement may well have been an orchestrated event. Application of the "intent" criterion to this case would presumably necessitate an inquiry into whether or not N & W actually "intended" to cease permanently all transportation service on the Rushville line regardless of the outcome of its simultaneous negotiations to sell the line to IHR. *See In re New York, Susquehanna & Western R.R.*, 504 F.Supp. 851, 855 (D.N.J.1980); *cf. Gregory v. Helvering*, 293 U.S. 465, 468–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935); *Bloomington Coca-Cola Bottling Co. v. Commissioner*, 189 F.2d 14, 16–17 (7th Cir.1951). Unfortunately, the Commission made no effort to undertake any such inquiry,[16] and its inade-

15. Most of these cases involve charges by the Commission that a particular carrier had "abandoned" a line—by ceasing service on the line indefinitely—without having first obtained a certificate of convenience and necessity to do so, as required by 49 U.S.C. § 10903. Though the fact patterns vary from that of the instant case, the central inquiry appears to be the same: apart from whether a certificate of convenience and necessity has been granted, has an "abandonment" in fact taken place? Courts have consistently held that it is the "intent" of the railroad—as evidenced by a spectrum of facts varying as appropriate from case to case—that should be the pivotal issue. Although we need not rule on this question here, *see infra* at 114–115, it is worth noting that the Commission conspicuously failed to take any cognizance of this related line of cases—each of which involved the Commission itself.

16. The Commission's failure to make any finding about "intent" in response to petitioner's allegations is particularly salient in this case because the record plainly contains facts suggesting that contacts, negotiations, and plans with respect to the sale of the line had been going on for some time. In 1982, as noted, IHR announced that it and N & W had indeed reached an *agreement* for the sale of the Rushville line to IHR. *See Indiana Hi-Rail Corp.— Feeder Line Acquisition, supra*, 366 I.C.C. at 46. Later, IHR took obvious steps to prepare for a takeover of the line: for example, on April 4, 1983—some four days *prior* to the ostensible renewal of negotiations on April 8, 1983—IHR issued a notice announcing its "adoption of all N & W tariffs and stations effective April 8, 1983." Reply Brief at 2; *see id.* at 3b; Petitioner's Brief at 27. Such actions by IHR are at least circumstantially relevant to whether N & W actually intended merely to abandon the line or instead intended mainly to effect a transfer to IHR.

Evidence involving actions by N & W itself, though conflicting, also exists. For example, N & W had been seeking abandonment authority with respect to the Rushville line since 1977. Such persistence suggests that N & W might well have planned simply to abandon the line if alternative dispositions were fruitless. *See In-*

quate factfinding prevents us from addressing the issue definitively ourselves. As such, in light of the Commission's failure to identify the criteria to be applied or address the relevant facts, we cannot rely upon the "abandonment" theory to resolve the labor protection issue.

## B.

■ In another case, we might be inclined to remand this matter to the Commission to allow it to address more thoroughly petitioner's concern over the bona fides of the asserted "abandonment" of the Rushville line. But we need not do so here because we find that we must nevertheless affirm the Commission's alternative basis for ruling that the transaction does not fall under § 11343: that prior to the acquisition, IHR was not a "carrier" within the meaning of § 11343, because it was an "exempt" feeder line operator licensed and operating exclusively under the new feeder line development program, 49 U.S.C. § 10910.

In order for § 11343 to be applicable, it is necessary, as noted, that a railway acquisition be one "involving" at least two carriers. *See supra* at 111. In order to qualify as a "carrier" for the purposes of § 11343, an acquiring entity must be one "providing transportation subject to the jurisdiction of the Interstate Commerce Commission under ... chapter 105 of this title...." 49 U.S.C. § 11343(a). Here, only one carrier is involved, because while N & W concededly meets this definition, IHR does not. IHR's only prior operations were those on the Connersville line, which, as noted, was acquired by IHR pursuant to the feeder line development program enacted by Congress in 1980. *See supra* at 108–109 and note 4. To encourage and facilitate entry into the feeder line market, the Congress, *inter alia*, expressly allowed program participants to elect to exempt themselves—with respect to feeder lines acquired under the program—from all regulation under Title 49 "except for the provisions of chapter 107 of this title with respect to transportation under a joint rate." 49 U.S.C. § 10910(g)(1); *see* H.R.Rep. 1035, 96th Cong., 2d Sess. 71–72 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4016–17; H.R.Rep. 1430, 96th Cong., 2d Sess. 124–25, *reprinted in* 1980 U.S. Code Cong. & Ad.News 4110, 4156–57. Section 11343 of Title 49 is itself in chapter 113, not chapter 107, and it does not deal with joint rates. The exemption option in § 10910(g)(1), moreover, by its very terms embraces chapter 105, which sets forth the Commission's general jurisdiction over rail carriers, *see* 49 U.S.C. §§ 10501–10505 (1982). As noted, IHR exercised the exemption option when it acquired the Connersville feeder line. J.A. 3. Accordingly, the Commission concluded that IHR was not "providing transportation subject to the jurisdiction of the ICC under chapter 105 of this title," because IHR was a feeder line operation that had elected, as authorized, to exempt itself from chapter 105, *inter alia*, with respect to the only line that it operated. J.A. 86. Thus, the ICC held, IHR was not a "carrier" for the purposes of § 11343, and therefore § 11343 did not apply to IHR's purchase of the Rushville line. *Id.*

This ground for the Commission's decision involves no factfinding, but rather construction of a narrow, specialized statute (49 U.S.C. § 10910(g)(1)) that the Commission has responsibility for integrating into the pre-existing railway regulation scheme, including 49 U.S.C. § 11343. We defer to the Commission's interpretation of a statute it is charged with administering unless there are compelling indications that the

*terstate Commerce Commission v. Baltimore & A. R.R., supra,* 398 F.Supp. at 462. On the other hand, as noted, N & W's letter of April 20, 1983 informing the Commission of its April 12, 1983 cessation of service on the line did not expressly state that the "line" had been "abandoned," but instead stated only that "operations" on the line had been "discontinued." J.A. 26, 40. This in-

consistency in N & W's formal notice suggests that N & W may well have sought to preserve the option of later attempting to resume its own operations on the line if the Commission were to deny IHR's exemption petition and the sale of the line were ultimately to fall through. Such evidence, again, would be quite relevant to any inquiry into intent.

Commission's interpretation is incorrect. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *CBS, Inc. v. Federal Communications Commission*, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981). Prior cases make clear that the acquisition of a single rail line by an entity that is not itself a carrier and that is not affiliated with any other carrier falls under § 10901, not § 11343. *In re Chicago, Milwaukee, St. P. & P. R.R.*, *supra*, 658 F.2d at 1169; *People of the State of Illinois v. United States*, *supra*, 604 F.2d at 524–26.[17] This reflects the fact that § 11343 is plainly concerned not with new, non-carrier entities entering the railway market through limited acquisitions such as the one at issue here, but with transactions integrating two or more carriers and with the effect of multi-carrier transactions on competition.[18] *People of the State of Illinois v. United States*, *supra*, 604 F.2d at 524–26. Indeed, prior cases have recognized that automatically subjecting non-carrier purchasers of railway lines to the mandatory labor protection requirements of § 11343 may well discourage such new entry into the rail

market. *E.g., In re Chicago, Milwaukee, St. P. & P. R.R.*, *supra*, 658 F.2d at 1711. Here, the Commission has determined that the unilateral exemption option in the feeder line development program, 49 U.S.C. § 10910(g)(1), was intended by Congress to allow a program participant that otherwise is a "non-carrier" to preserve its "non-carrier" status for the purposes of § 11343. The same legislative considerations supporting the statutory exemption option in § 10910(g)(1) with respect to most of Title 49 in general support the exemption—for feeder line program participants—with respect to § 11343 in particular. Given the several broad incentives contained in the feeder line development legislation, *see* H.R.Rep. 1430, 96th Cong., 2d Sess. 124–25, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4110, 4156–57, nothing in the Commission's construction of 49 U.S.C. § 10910(g)(1) is inherently unreasonable. *See CBS, Inc. v. Federal Communications Commission*, *supra*, 453 U.S. at 390, 101 S.Ct. at 2827.

Petitioner advances several arguments that the Commission's interpretation of the statute is incorrect. Only one raises any concern worth addressing.[19] Petitioner

---

**17.** To be sure, § 11343 does include two specific categories of "non-carrier" acquisitions, although in each case at least two carriers are nonetheless "involved." The first of these categories, listed at § 11343(a)(4), is the "acquisition of control of at least *2* carriers by a person that is not a carrier." (Emphasis added). In the transaction at issue here, however, IHR acquired only *one* line of railway, the Rushville line, from *one* carrier, N & W. The second category, listed at § 11343(a)(5), is the "acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers." In this connection, there is a suggestion in petitioner's reply brief that at the time of the transaction at issue here, IHR owned a "75% subsidiary, Ohi-Rail Corporation, ... a designated operator in the State of Ohio." Reply Brief at 8 n. 19. Petitioner made no argument before the Court, however, that this relationship might have triggered § 11343(a)(5). More importantly, petitioner failed to raise any such issue before the Commission itself. Thus, no such issue is properly before us and we need not consider it here. *D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n*, 466 F.2d 394, 413–414 (D.C.Cir.), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

**18.** We note that in 1982 the Commission promulgated a revised regulation (governing applications for Commission authority under § 10901) that affects whether certain railway acquisitions are to be treated under § 11343 or § 10901. *Application Procedures for a Certificate to Construct, Acquire, Or Operate Railroad Lines*, 365 I.C.C. 516 (1982) (adopting revised rule now codified at 49 C.F.R. § 1150.1(a)). We have no occasion here to express any opinion with respect to that Commission action, which is currently pending review before another panel of this Court in *Simmons v. Interstate Commerce Commission*, No. 82–1421 (D.C.Cir.).

**19.** Petitioner argues, for example, that the Commission errs in relying on the language now codified in 49 U.S.C. § 11343 (1982) because the prior version of the provision, 49 U.S.C. § 5(2) (1976 ed.), referred only to "carriers," 49 U.S.C. § 5(2)(a)(i) (1976 ed.), not "carriers providing transportation subject to the Commission's jurisdiction ... under chapter 105 ... [,]" 49 U.S.C. § 11343(a) (1982). To be sure, the recodification was not intended to work a substantive change in the statute. *Trailer Marine Transport Corp. v. Federal Maritime Administration*, 602 F.2d 379, 383 n. 18 (D.C.Cir.1979); *Purolator*

complains that if the Commission's interpretation of § 10910(g)(1) would allow a given feeder line program participant to invoke its special "noncarrier" status each time it acquired a non-feeder line, the program participant could use the exemption to construct an "empire" of railway lines "free from regulation" by the Commission. Petitioner's Brief at 18. The Commission, however, provides a ready response to petitioner's expansive scenario, explaining that

> [the Commission] agree[s] that the feeder line exemption runs only to the feeder line. The Commission's holding is simply that the feeder line operation, because it is exempt, will not make IHR a carrier subject to section 11343 (J.A. 86).... The Commission's reading of section 10910(g) does not mean that IHR could build railroad empires outside of the Commission's scrutiny as UTU fears ([Petitioner's Brief at] 18) because once IHR acquires a nonexempt line, it would become a carrier subject to Section 11343.

Respondents' Brief at 43. Petitioner's argument, thus, fails to identify any compelling reason for finding that the Commission's interpretation of the statute is wrong.

Accordingly, the finding that IHR was not a "carrier" within the meaning of § 11343 must be affirmed. As this was not a § 11343 acquisition, the Commission was under no mandatory duty to impose labor protective conditions on IHR.

### III.

■ Where the acquisition of a railway is governed by § 10901 rather than § 11343, the decision whether to impose labor protective conditions on the acquiring entity rests within the Commission's own discretion. *See* § 10901(c)(1)(A)(ii); *Railway Labor Executives' Ass'n v. United States, supra,* 697 F.2d at 286; *Simmons v. Interstate Commerce Commission, supra,* 697 F.2d at 340; *In re Chicago, Milwaukee, St. P. & P. R.R., supra,* 658 F.2d at 1169; *Okmulgee Northern Ry.—Abandonment, supra,* 320 I.C.C. at 645. In this case, contrary to petitioner's contention, the Commission's decision not to impose employee protective conditions on IHR was clearly an appropriate exercise of its discretion.

First, the Commission has traditionally not imposed such conditions on an acquiring entity—where the acquiring entity is a non-carrier—in the absence of a demonstrated justification or need. *See In re Chicago, Milwaukee, St. P. & P. R.R., supra,* 658 F.2d at 1169; *Railway Labor Executives' Ass'n v. United States, supra,* 697 F.2d at 286 (10th Cir.1983). The petitioner has identified no such justification or need. Moreover, we are satisfied that the Commission could rationally conclude from the entire record that circumstances did not require the imposition of labor protective conditions in this case, particularly in light of the special congressional purpose being served by the feeder line development program. Second, the Commission took into account the fact that employee protective conditions were already imposed on N & W as a condition to "abandonment." *See* J.A. 58; Petitioner's Brief at 15a–18a; *supra* note 9. Third, the Commission considered the potential expense and burden to IHR in circumstances where there was not a dem-

---

*Courier Corp. v. Interstate Commerce Commission,* 598 F.2d 225, 226 n. 2 (D.C.Cir.1979). However, the recodifiers expressly inserted the additional words in § 11343 for clarity. *See* H.R.Rep. 1395, 95th Cong., 2d Sess. 160 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3169. Further, 49 U.S.C. § 10910(g)(1) was enacted in 1980, *after* the 1978 adoption of the recodified language in 49 U.S.C. § 11343(a). The Commission's interpretation of § 10910(g)(1) in light of the present wording of § 11343(a) therefore cannot be deemed unreasonable.

Petitioner also cites cases holding that various carriers remained subject to § 11343 (or its predecessor) despite the fact that the carrier enjoyed certain exemptions pursuant to other statutory provisions. *See, e.g., Valley Line Company v. United States,* 390 F.Supp. 435 (W.D.Pa. 1975); *McAllister Lighterage Line, Inc.—Purchase,* 265 I.C.C. 483, 487 (1948). However, these cases are inapposite because none of them involves the exemption provided for in § 10910(g)(1).

onstrated need and where former employees had protection. *See* J.A. 57–58. Finally, the Commission concluded that IHR would probably not acquire the line if those conditions were imposed. *See* J.A. 57–58, 88.[20]

We recently reiterated that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Brae Corp. v. United States*, 740 F.2d 1023, 1038 (D.C.Cir.1984) (quoting *Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)), *cert. denied* — U.S. —, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Given all the circumstances of this case, and given that our holding is restricted to the acquisition of a rail line by an entity previously operating only as a "feeder line" under 49 U.S.C. § 10910, we cannot say that the Commission's refusal to impose labor protective conditions on IHR was arbitrary or capricious.

### IV.

In transactions involving the acquisition of a railway line under 49 U.S.C. 10901, the Commission has the authority, pursuant to 49 U.S.C. 10505 (1982), to exempt the acquiring entity from rail regulation with respect to its acquisition and operation of the line if it finds 1) that such regulation "is not necessary to carry out the rail transportation policy set forth in 49 U.S.C. 10101a" of the Interstate Commerce Act, *and* 2) that either "the transaction or ser-

vice is of limited scope" or the regulation "is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a).[21] In this case, the Commission granted IHR a permanent exemption from all the requirements of 49 U.S.C. Subtitle IV with respect to the acquisition and operation of the Rushville line. J.A. 59. Such exemption decisions must be upheld unless the decision to grant the exemption can be shown to have been "arbitrary, capricious, an abuse of discretion or otherwise contrary to law." *Simmons v. Interstate Commerce Commission, supra,* 697 F.2d at 342. Petitioner has failed to make such a showing.

In granting IHR a general exemption from most rail regulation, the Commission considered several factors which the Commission could legitimately have deemed to render regulation unnecessary. *See* J.A. 9, 57, 89. In its July 11, 1983 decision, the Commission expressly found that consideration both of barriers to entry, *see* 49 U.S.C. § 10101a(7) (1982), and efficiency of business operation, *see id.* § 10101a(10), supported granting the exemption. Petitioner points to no unconsidered factor that might possibly have rendered the conclusion to grant the exemption arbitrary and capricious in the circumstances of this case. *Cf. Coal Exporters Ass'n, Inc. v. United States,* 745 F.2d 76, 93–94 (D.C.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct 2151, 85 L.Ed.2d 507 (1985). Despite petitioner's protestations, the Commission's failure explicitly to address each of the remaining factors in § 10101a "is not in itself fatal." *Coal Exporters Ass'n, Inc. v. United*

**20.** *Cf. Railway Labor Executives' Ass'n v. Interstate Commerce Commission,* 735 F.2d 691, 703–04 (2d Cir.1984) (Friendly, J.) ("The Commission was within its discretion in thinking that [former employees of the previous operator of a line] would be better off with jobs with [the new, acquiring operator] ... than with [certain labor protective] conditions ... which [the new operator] would not accept.").

**21.** Title 49 U.S.C. § 10505(a) (1982) (formerly 49 U.S.C. § 12(1)(b) (1976 ed.)) provides, in its entirety, that:

(a) In a matter related to a rail carrier providing transportation subject to the juris-

diction of the Interstate Commerce Commission under this subchapter [of chapter 105], the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

*States, supra,* 745 F.2d at 94 n. 22. The Commission " 'need not explicitly discuss in its decision each factor enumerated' " in 49 U.S.C. § 10101a as long as " 'the essential basis of the ICC's rationale [is] clear enough so that a court can satisfy itself that the ICC has performed its function....' " *Id.* (quoting *Alamo Express, Inc. v. Interstate Commerce Commission,* 673 F.2d 852, 860 (5th Cir.1982)). On the facts of this case, and in consideration of the findings that the Commission did make, we are satisfied that the Commission has met this standard.

Petitioner has similarly failed to show that the Commission's other findings—that service provided on the Rushville line is limited in scope, and that there is no danger of abuse of market power with respect to service on the line, J.A. 57–58—were arbitrary or capricious. In support of the former finding, the Commission noted that the line is only 22.21 miles long. *Id.* In support of the latter finding, the Commission noted that the exemption decision, far from threatening shippers with a potential abuse of market power, appears likely to ensure that rail service on the line remains an available alternative in the region. *Id.; see Coal Exporters Ass'n, Inc. v. United States, supra,* 745 F.2d at 90.[22] On such facts, neither finding is irrational, *see American Trucking Ass'ns v. ICC,* 656 F.2d 1115, 1127 (5th Cir.1981), and either finding, in conjunction with the Commission's conclusion that regulation was not necessary to carry out the objectives of the Interstate Commerce Act, would suffice under 49 U.S.C. 10505(a) to support the exemption decision.

## V.

On August 1, 1983, UTU timely filed a petition for reconsideration of the Commission's July 11, 1983 decision, challenging both the refusal to impose labor protective conditions on IHR, and the decision to grant IHR a permanent exemption pursuant to § 10505(a). J.A. 71–76, 84. In the Commission's October 26, 1983 decision denying UTU's petition for reconsideration, the Commission explained what it deemed to be the appropriate standard of review to be applied:

UTU seeks to have the exemption denied. In cases where an exemption has been granted the appropriate remedy is the revocation of the exemption. 49 U.S.C. 10505(d). The party seeking to have an exemption revoked has the burden of showing that application of a provision of 49 U.S.C. Subtitle IV is necessary to carry out the transportation policy of 49 U.S.C. 10101a. Our following discussion of the issues raised by UTU shows that no ground for revocation of the exemption has been given. Therefore, the petition will be denied.

J.A. 84–85.

UTU argues that the Commission, in response to UTU's petition for reconsideration, should have considered both IHR's application for the § 10505(a) exemption and the collateral labor protection issue *de novo,* fixing the burden of proof on IHR. Thus, UTU complains that the Commission's treatment of the petition for reconsideration as one for revocation under § 10505(d) [23] improperly placed the burden of proof on UTU with respect to the matters raised in the petition.

■ UTU's objection to the Commission's treatment of its petition for reconsideration fails to state a basis for relief. First, as the Commission points out, even if the statutory section for "revocation" of an exemption had not been invoked, the burden would still have been on UTU, as the petitioner for reconsideration, to show "ma-

---

**22.** In the November 4, 1982 decision approving N & W's abandonment application, the Commission expressly noted that the area served by the Rushville line was also served by two other rail carriers and numerous motor carriers. Petitioner's Brief at 9a.

**23.** Title 49 U.S.C. § 10505(d) provides that:

The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title.

terial error, new evidence, or substantially changed circumstances" that justified reversal of any aspect of the Commission's earlier decision. 49 C.F.R. § 1115.4 (1984). Second, without ruling as to whether the Commission was or was not correct in invoking the "revocation" provision in § 10505(d), it plainly appears from the Commission's decision on reconsideration that the Commission fully addressed all of UTU's arguments as to the alleged errors in the Commission's earlier decision, with respect to both the labor protection issue and the § 10505(a) exemption. *See* J.A. 84–89. Thus, the "substantial rights" of UTU were not affected by any error the Commission may have made in purporting to apply § 10505(d) to the petition for reconsideration instead of § 10505(a). 28 U.S.C. § 2111 (1982).

CONCLUSION

For the foregoing reasons, the decision of the Commission is affirmed.