807 F.2d 1025
 257 U.S.App.D.C. 110
 CMC REAL ESTATE CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Iowa Interstate Railroad, Ltd., Patrick W. Simmons, Intervenors.
CMC REAL ESTATE CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Iowa Interstate Railroad, Ltd., Patrick W. Simmons, Intervenors.
 Nos. 84-1553, 85-1287.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 6, 1986.
Decided Dec. 23, 1986.
 
 John Broadley, Washington, D.C., for petitioners in Nos. 84-1553 and 85-1287. Robert H. Wheeler, Sarah H. Steindel, Chicago, Ill., and Sander M. Bieber, Washington, D.C., were on the brief, for petitioners in Nos. 84-1553 and 85-1287. William L. Phillips, Lisa C. Styles, and Lawrence M. Stroik, Chicago, Ill., entered appearances for petitioners in No. 84-1553.
 Gordon P. MacDougall, Washington, D.C., for intervenor, Patrick W. Simmons in Nos. 84-1553 and 85-1287.
 Edward J. O'Meara, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, I.C.C., and Catherine G. O'Sullivan, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents in Nos. 84-1553 and 85-1287.
 Robin B. Katz, Chicago, Ill., a member of the bar of the Supreme Court of Illinois, pro hac vice by Special Leave of Court, with whom Richard M. Smith and Patricia A. McCoy, Washington, D.C., were on the brief, for intervenor, Iowa Interstate Railroad, Ltd. in Nos. 84-1553 and 85-1287.
 Before MIKVA and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge McGOWAN.
 McGOWAN, Senior Circuit Judge:
 
 
 1
 In this case, we consider consolidated proceedings in which the Interstate Commerce Commission ("ICC" or "Commission"), respondent in these proceedings, exempted Iowa Interstate Railroad, Ltd. ("Iowa Interstate"), from prior approval under 49 U.S.C. Secs. 10901 and 11301. Iowa Interstate, a new carrier, sought expeditiously to commence permanent rail service over the abandoned Rock Island lines in Iowa and Illinois. The Trustee of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Milwaukee Trustee" or "petitioner") and the Iowa Railroad Company ("IRC" or "petitioner") seek review of two proceedings before the ICC. Petitioners challenge as arbitrary and capricious the Commission's order granting an exemption from regulation allowing Iowa Interstate to operate over a line of the former Chicago, Rock Island and Pacific Railroad Company ("Rock Island").
 
 
 2
 The first challenged order granted temporary exemptions from regulation, thus allowing various rail carriers to continue previously authorized operations over portions of the Rock Island's abandoned rail system. Decision, F.D. No. 30489. The second proceeding, involved in this appeal, Finance Docket No. 30554, was initiated when Iowa Interstate, an intervenor in this appeal, sought a permanent exemption from the normal Commission procedure for its proposal to conduct rail operations on the Council Bluffs to Blue Island line. The petition was granted, effective immediately, in an order served October 1, 1984. Decision, F.D. No. 30554.
 
 
 3
 Petitioners also challenge the Commission's decision not to provide a short transition period before the new carrier was allowed to operate the line exclusively. Intervenor United Transportation Union ("UTU") contends that the ICC should have provided labor-protective conditions, as mandated by 49 U.S.C. Secs. 11343 and 11347. For the reasons articulated below, we affirm the Commission's orders in all respects.
 
 I.
 
 4
 Among the many railroads to succumb to financial difficulties in the 1970s was the Rock Island, which operated a trunk line through the grain belt from Omaha through Iowa and on to Chicago.[1] In 1975, the Rock Island filed for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205 (1975), and in 1979 ceased operation, following a crippling strike. The Commission designated carriers to provide service over the line in place of Rock Island, pursuant to the directed service provisions of 49 U.S.C. Sec. 11125 (1978).
 
 
 5
 Just as the directed service orders were about to expire, Congress enacted the Rock Island Railroad Transition and Employee Assistance Act, Pub.L. No. 96-254, 94 Stat. 399, 409 (1980) [hereinafter cited as "RITEA"]. RITEA was to insure continued service "until such time as the transfers of portions of the Rock Island lines could be consummated." S.Rep. No. 614, 96th Cong., 2d Sess. 2 (Mar. 4, 1980). Pursuant to section 122 of that Act, the ICC authorized several carriers to operate over the abandoned Rock Island lines pending reorganization. IRC, which commenced service over much of the 552-mile Council Bluffs-Blue Island line, and Milwaukee Trustee, which operated a 54-mile segment of the same line, were among those carriers.
 
 
 6
 The Rock Island was reorganized into the Chicago Pacific Corporation ("CPAC") on June 1, 1984. Decision, F.D. No. 30489, at 1. CPAC assumed ownership of all Rock Island lines not yet sold, including the Council Bluffs-Blue Island line. See Iowa Interstate Petition at 3 (Aug. 25, 1984) [hereinafter cited as "Petition"]. Because the Commission's authority under RITEA expired at the conclusion of the Rock Island reorganization, the Commission initiated Finance Docket No. 30489 in May of 1984, for the purpose of granting temporary exemptions from regulation to permit the carriers operating on the Rock Island's system to continue their operation. Such exemptions were granted in a decision served May 31, 1984. Decision, F.D. No. 30489, at 2. IRC and Milwaukee Trustee continued to operate under a temporary exemption pursuant to 49 U.S.C. Sec. 10505. According to the Commission's order, these operating rights were scheduled to terminate when "CPC [sic] disposed of the property." Decision, F.D. No. 30489, at 2.
 
 
 7
 To ensure the continuation of future rail service in the vital east-west Rock Island corridor, local Iowa shippers banded together to form the Heartland Rail Corporation ("Heartland"), and determined to purchase the line themselves. Petition at 4-5. On July 20, 1984, Heartland entered into an agreement with CPAC for the purchase and sale of the Council Bluffs to Blue Island line. On the same date, Iowa Interstate entered into a long-term lease of the line with Heartland, to become effective upon the closing of the purchase agreement. Petition at 4-6 and Exhibits C and D, F.D. No. 30554 (filed August 27, 1984).
 
 
 8
 CPAC and Heartland consummated the sale, with financial assistance from the Iowa Railway Finance Authority ("IRFA") and Citicorp, on October 10, 1984. See Decision, F.D. No. 30554, at 3. IRC and Milwaukee Trustee had attacked Heartland's financing in the Iowa state court, challenging the legality of the state-subsidized loan Heartland sought to finance the purchase of the line. They obtained a temporary injunction, restraining termination of their leases with CPAC. Associated General Contractors v. Fitzgerald, Equity No. CE 019 11197 (Iowa Dist.Ct.1984).
 
 
 9
 The proceedings in ICC Finance Docket 30554 were initiated on August 27, 1984 when Iowa Interstate petitioned the ICC for exemption[2] from Interstate Commerce Act provisions which otherwise would have required Iowa Interstate to obtain the Commission's prior approval of the lease transaction. Decision, F.D. No. 30554, at 1. The Petition requested expedited consideration and that the Commission grant an "immediately" effective exemption prior to the September 30, 1984 closing date contemplated in the purchase agreement and lease. Petition at 13-15. In a decision served on October 1, 1984, the Commission granted Iowa Interstate's petition, effective on the date of decision, September 28, 1984. Decision, F.D. No. 30554.[3] Iowa Interstate commenced operations on November 2, 1984.
 
 
 10
 Instead of vacating the line on October 10, IRC and Milwaukee Trustee continued to occupy the track, collecting revenues. They petitioned the ICC for a thirty-day transition period, which was denied by an order served on October 30, 1984. Decisions, F.D. Nos. 30489 and 30554. The Commission confirmed that operating authority had lapsed on October 10, the date of closing, and simultaneously denied a transition period. Id. Milwaukee now seeks review of the October 30 order in No. 84-1553.
 
 
 11
 Milwaukee Trustee and Patrick W. Simmons, Illinois Legislative Director for UTU, filed motions to reopen Finance Docket No. 30554, the Iowa Interstate exemption proceeding. See Decision, F.D. No. 30554, at 1. Milwaukee Trustee, responding to the Commission's October 4, 1984 Federal Register notice inviting petitions to reopen, 49 Fed.Reg. 39,245 (Oct. 4, 1984), filed a petition. The Commission accepted both petitions but declined to reopen the proceedings. Decision, F.D. No. 30554, at 3.
 
 
 12
 Iowa Interstate sued the Milwaukee Trustee on April 8, 1985, seeking immediate payment of the freight revenues the Trustee had collected while occupying the line between October 10 through October 30, 1984. In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co., No. 77 B 8999 (N.D.Ill.). Petitioners appealed the March 15, 1985 Commission order. This Court granted a motion to consolidate the two appeals for purposes of briefing and oral argument. Order at 2 (filed July 1, 1985) (per curiam). Milwaukee Trustee petitioned the Northern District of Illinois for a stay of Iowa Interstate's claim for post-petition revenues pending disposition of these appeals. Motion to Dismiss and Stay Application of Iowa Interstate Railroad, Ltd., at 1, In re Chicago, Milwaukee, St. Paul & Pacific Railroad Company, supra. The motion was denied. Id., Decision on Motions Involving Application of Iowa Interstate Railroad Limited (Sept. 5, 1985).
 
 
 13
 Milwaukee Trustee and IRC allege that the ICC's order, which exempted Iowa Interstate from regulation, was summarily entered without observance of procedures required by law and was arbitrary and capricious. Br. of Joint Petitioners at 19-21. Petitioners contend also that the Commission acted improperly in terminating their operating rights without a short transition period, creating what petitioner's term as "retroactive liability without proper notice." Id. at 22. Finally, intervenor UTU claims that the Commission erred in not imposing employee protective conditions under 49 U.S.C. Secs. 11343 and 11347. Br. of UTU at 9-17. We address these contentions in turn.
 
 II.
 
 14
 Milwaukee Trustee and IRC contend that the ICC failed to provide a meaningful opportunity for a hearing in proceedings that involved vigorously disputed issues of adjudicative fact. Br. of Joint Petitioners at 11. Petitioners assert also that the October 1, 1984 order was arbitrary and capricious. Id. at 19-21. We disagree.
 
 
 15
 The ICC's decision of October 1, 1984 exempting Iowa Interstate from Commission approval of its rail operations is subject to review under sections 2321 and 2342 of the Judiciary Code, which provide for review in the Courts of Appeals of "rule[s], regulation[s], or order[s] of the Interstate Commerce Commission...." 28 U.S.C. Secs. 2321(a), 2342(5) (1982). Under section 706 of Title 5 of the United States Code, which applies to all reviewable agency orders, an agency order must be set aside if it was entered "without observance of procedure required by law." 5 U.S.C. Secs. 701(a), 706(2)(A) and (D) (1982).
 
 
 16
 The standard of review of the ICC's decision to grant an exemption is well settled: the agency's action must be upheld unless it lacks a rational basis. See, e.g., Simmons v. ICC, 697 F.2d 326, 342 (D.C.Cir.1982) ("Simmons"); National Small Shipments Traffic Conference, Inc. v. CAB, 618 F.2d 819, 826 (D.C.Cir.1980). A decision to exempt certain transportation from regulation is "an essentially legislative policy judgment." National Small Shipments, 618 F.2d at 830 n. 23 (citing Industrial Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 475 (D.C.Cir.1974)). Because the ICC's decision to exempt is an exercise of its rulemaking authority, the scope of review is quite narrow. Simmons, 697 F.2d at 342; American Trucking Ass'ns v. ICC, 656 F.2d 1115, 1125 (5th Cir.1981) ("ATA"). It is limited to whether the agency's decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. See Simmons, 697 F.2d at 342; United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).
 
 
 17
 The ICC need only make a showing that "all relevant factors were considered and that the Commission has articulated a rational connection between the facts as it finds them and the conclusion it premises on those facts." ATA, 656 F.2d at 1127. This Court therefore neither weighs the evidence nor assesses the wisdom of the rules promulgated. Rather, our task is to examine the record to determine whether there are facts capable of sustaining the agency's findings. Simmons, 697 F.2d at 342; National Tour Brokers Association v. ICC, 671 F.2d 528, 532 (D.C.Cir.1982).
 
 A. Right to a Hearing
 
 18
 In Finance Docket No. 30554, the Commission succeeded in approving Iowa Interstate's exemption application in five weeks, in time for the September 30, 1984 closing. Despite this expeditious treatment, the Commission afforded the Milwaukee Trustee and IRC three opportunities for written comments and testimony. Petitioners submitted comments on Iowa Interstate's petition before the Commission entered its decision. They filed motions to clarify the Commission's October 1 order. The Milwaukee Trustee moved to reopen the proceeding. All told, the two railroads submitted three rounds of filings. Despite these opportunities for comment, petitioners now complain that they were denied "a hearing" in contravention of the Constitution and the Commission's own rules.
 
 
 19
 The exemption criteria upon which this Court must focus in determining whether the Commission acted reasonably in granting an exemption is set out in 49 U.S.C. Sec. 10505 ("section 10505").[4] Thus, an examination of section 10505 background history would be useful. In the wake of the collapse of the Rock Island and several other major railroads in the 1970s,[5] Congress drastically overhauled the Interstate Commerce Act to encourage revived private investment in rail transportation. See Simmons, 697 F.2d at 328. Concluding that overregulation and bureaucratic inflexibility had stifled the growth of the railroads, see H.R.Rep. No. 1035, 96th Cong., 2d Sess. at 38, 115, reprinted in 1980 U.S.Code Cong. & Ad.News at 3983, 4059, Congress loosened the vise grip of regulation through several important enactments, including the Staggers Act. See Simmons, 697 F.2d at 328.
 
 
 20
 The Staggers Act hastened the pace of rail deregulation through the expanded exemption provisions of 49 U.S.C. Sec. 10505 (1985 Supp.). The express purpose of Congress in enacting section 10505 was to grant the Commission authority to review its regulations and withdraw any regulations found to be unnecessary to effectuate the goals of national transportation policy or regulations that served little or no public purpose.[6]
 
 
 21
 In explaining the ICC's exemptive authority, Congress noted that this provision was to be an "important cornerstone" of a new flexible approach to regulating the rail industry.[7] The ICC was charged with the responsibility for " 'actively pursuing exemptions for transportation and service that comply with the section's standards.' " ATA, 656 F.2d at 1119 (quoting H.R.Rep. No. 96-1035, 96th Cong., 2d Sess. 60 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News, 3978, 4005).[8]
 
 
 22
 The Staggers Act also eliminated the requirement that the Commission afford a hearing prior to approving an exemption. See H.R.Rep. No. 1430, 96th Cong., 2d Sess. 104-05, reprinted in 1980 U.S.Code Cong. & Ad.News 4136-37. Under former section 12(1)(b) (1976 ed.) (predecessor of section 10505), the Commission could grant an exemption under certain circumstances only "after notice and reasonable opportunity for a hearing." In 1980, however, Congress specifically removed that hearing requirement as part of its overall intention to broaden the ICC's exemption authority. Ex Parte No. 400.[9]
 
 
 23
 The railroads were provided three opportunities to submit written evidence. The need for immediate action to secure continuous service to shippers must be balanced against the temporary duration of the railroads' exemptions. The benefit of avoiding the expense and delay of a trial-type hearing outweighed the slight increase in probative value that cross-examination would have afforded for purposes of due process. See Goss v. Lopez, 419 U.S. 565, 583, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975); cf. United States v. Florida East Coast Ry. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (opportunity to submit written materials satisfies APA requirement of "hearing").
 
 B. Right to Notice
 
 24
 Petitioners also claim to be aggrieved because the Commission did not give interested parties notice of Iowa Interstate's petition prior to its decision. Br. of Joint Petitioners at 14. Petitioners have no "right" to notice in that Ex Parte No. 400 eliminated the initial notice and comment procedure in most cases.[10]
 
 
 25
 Moreover, petitioners had actual notice of Iowa Interstate's application. See id. Due to widespread actual public knowledge of the proposal, comments both favoring and opposing the exemption proposal were filed. Certified Index Documents, F.D. 30554, Nos. 2-10, 12-17, 19-22, 24-28, 30-31. Finally, the Commission published notice of the exemption in the Federal Register six days before closing, inviting petitions to reopen the proceedings. 49 Fed.Reg. 39,245 (Oct. 4, 1984).
 
 
 26
 C. Expedited Handling of Iowa Interstate's Petition
 
 
 27
 Petitioners next attempt to set aside the October 1 order by disputing the extraordinary nature of the circumstances surrounding Iowa Interstate's application that justified expedited handling according to Commission procedure under Ex Parte No. 400. We defer to the Commission's finding that this proceeding presented "extraordinary circumstances" justifying immediate effectiveness.
 
 
 28
 First, the very fact that the lines at issue were abandoned properties, whose service could have been terminated at any time by CPAC without additional Commission authorization, marked this proceeding for special treatment. Because the initial closing date of the agreement between Heartland and CPAC was scheduled for September 30, 1984, consummation on that date would have automatically terminated the authority of temporary operators to conduct service. See Decision, F.D. 30489, at 2. While Milwaukee Trustee and IRC may have been "prepared to continue serving shippers on the line," Br. of Joint Petitioners at 16, they were without authority to do so. In addition, Iowa Interstate requested immediate effectiveness of the exemption decision because of the need to perform maintenance on the lines before the onset of winter. Petition at 14.
 
 
 29
 Finally, Iowa Interstate had an urgent need for revenues to meet its lease and debt service obligations. Br. of Iowa Interstate at 19. Under such circumstances, an immediately effective order was imperative to the financial survival of the start-up railroad. In view of the national policy of preserving continued rail service over lines otherwise destined for abandonment, the Commission's determination that expedited handling was necessary is a rational interpretation of its rules directed at effectuating Congressional transportation policy.
 
 D. Consideration of Material Evidence
 
 30
 Milwaukee Trustee and IRC assert that the Commission failed to give meaningful consideration to all material evidence presented in Finance Docket No. 30554. See, e.g., Br. of Joint Petitioners at 16, 20. Petitioners fault the ICC for "a laundry list of findings" taken from 49 U.S.C. Sec. 10101a (1982). Id. at 20. Rather, we find that, in granting Iowa Interstate an exemption to operate, the Commission conducted an exhaustive analysis of the factors entering into its decision.[11]
 
 
 31
 This Circuit has repeatedly held that the Commission " 'need not explicitly discuss in its decision each factor enumerated' in 49 U.S.C. Sec. 10101a as long as 'the essential basis of the ICC's rationale [is] clear enough so that a court can satisfy itself that the ICC has performed its function ...'." Black v. ICC, 762 F.2d 106, 118 (D.C.Cir.1985) (quoting Alamo Express, Inc. v. ICC, 673 F.2d 852, 860 (5th Cir.1982)).
 
 
 32
 The railroads argue a remand is required because the Commission allegedly overlooked the financial ability of Iowa Interstate in considering whether to grant it an exemption. Br. of Joint Petitioners at 20. Certainly, when the ICC considers applications under sections 10901 and 11301 of the Interstate Commerce Act, one of the critical issues it considers is the financial ability of the applicant to provide essential service to shippers.[12]
 
 
 33
 But petitioners proceed on the erroneous assumption that Iowa Interstate applied under the certificate provisions of 49 U.S.C. Sec. 10901. Iowa Interstate applied, rather, under the exemption provisions of section 10505, which dispenses with exhaustive financial scrutiny.[13] This is consistent with the statutory goal of preferring new ventures, albeit somewhat risky ones, to wholesale abandonment.
 
 
 34
 Even if Congress had mandated a finding of solvency, the agency gave proper consideration to Iowa Interstate's financial prospects. In its application, Iowa Interstate projected funding of $6 to $8 million in equity, $8 to $10 million in commercial loans, a $15 million low-interest loan from the "IRFA," and up to $4.5 million in temporary financing available from CPAC. Petition at 5. Iowa Interstate attested to the rail experience of its operating officers, the location and number of shippers on the line, and the commodities and volume of traffic which had been and were estimated to be transported. See id. at 10, Exhibit 10.
 
 
 35
 Petitioners assail the Commission for failing to discuss Heartland's uncertain financing or the accuracy of Iowa Interstate's traffic projections in light of existing competition on the line. See Br. of Joint Petitioners at 15-16, 20. But the ICC did address those concerns in its October 1 decision. The Commission rejected petitioners' arguments concerning excess capacity, noting that most of the line operated under temporary exemptions that were due to terminate upon CPAC's disposition of the property. Decision, F.D. No. 30554, at 6. The Commission knew that the financing remained pending, but determined that Heartland's IRFA financing application was not a Commission-regulated transaction and that the merits of that proposal were not material to the exemption issue. Id. at 4. The ICC was thoroughly familiar with the financial deterioration of the Iowa and Milwaukee railroads and understood the strong economic incentive CPAC had to tear up the track for scrap.
 
 III.
 
 36
 Petitioners challenge the ICC's interpretation of when their Commission-issued temporary exemptions to operate ended and Iowa Interstate's permanent authority began. Petitioners contend that the Commission, in its decision of October 30, 1984 and in its March 15, 1985 decision denying rehearing, refused to provide for an orderly transition and "purported to find, based on an improper interpretation of an earlier order, that IRC's and Milwaukee Trustee's operating rights had terminated twenty days earlier." Br. of Joint Petitioners at 22. IRC and Milwaukee Trustee suggest that the ICC, in taking this action, "purported to create retroactive liability without proper notice, and without considering evidence as to critical public interest issues." Id. We find petitioners' position without merit.
 
 
 37
 At the heart of the dispute is the language contained in the Commission's March 31, 1984 order in F.D. 30489. In that order, the ICC exempted Milwaukee Trustee and IRC from prior approval under section 10901 to operate over Rock Island lines temporarily. The Commission limited their authority to operate, noting: "This temporary exemption will terminate on the effective date of a decision granting permanent authority (either by application or exemption) or upon disposition of the property by [CPAC]." In its October 30, 1984 decision, the Commission interpreted this to mean that the temporary exemption "terminated on the date [CPAC] disposed of the line (October 10, 1984)." Decision, F.D. No. 30489, at 2. It is well established that an agency's interpretation of the intended effect of its own orders is controlling unless clearly erroneous. See, e.g., Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 292 (D.C.Cir.1981). The ICC's interpretation is a reasonable and fair reading of its own order, entitled to deference by this Court.
 
 
 38
 Petitioners claim that the ICC's language limiting the duration of the exemption has no binding effect because it was not specifically set forth in the ordering paragraphs. Br. of Joint Petitioners at 24. As such, they assert, the Commission's later interpretation consequently amounted to an imposition of improper "retroactive liability," because no other decision purported to terminate petitioners' operating rights prior to October 30.
 
 
 39
 This argument is frivolous. The ICC granted a "temporary exemption" in its ordering paragraph. The body of the decision contained the operative language defining what is meant by the term "temporary" in these circumstances. The terms of a Commission order must be read in conjunction with the accompanying report, where the terms of the order are alleged to be ambiguous. See, e.g., Georgia Public Service Commission v. United States, 283 U.S. 765, 771, 51 S.Ct. 619, 621, 75 L.Ed. 1397 (1931) (citing American Express Co. v. South Dakota, 244 U.S. 617, 627, 37 S.Ct. 656, 661, 61 L.Ed. 1352 (1917).
 
 
 40
 Petitioners argue that even if the statement concerning termination could be considered an order, its application in the circumstances here was so unclear that it did not give fair notice that the temporary exemptions were intended to be terminated as of the date of the Heartland CPAC closing. Br. of Joint Petitioners at 25-28. Petitioners argue also that, under the circumstances presented to the Commission, it was not clear that there was a "disposition" of property on October 10, 1984 within the meaning of the May 31, 1984 decision, because CPAC's "disposition" of the Council Bluffs to Blue Island line was allegedly not yet complete due to the state court proceeding. In effect, petitioners claim that the state court's temporary injunction against formally terminating ICC's lease had the effect of overriding the Commission's decisions.
 
 
 41
 This argument must be rejected. The Commission's interpretation of what is meant by "disposition," i.e., sale closing, is the same as that used in the governing statute, Section 122(a) of RITEA, 45 U.S.C. Sec. 1017(a) (1985 Supp.), to refer to CPAC's relinquishment of ownership rights through outright sale. The legislative history makes this clear.[14] The statutory language thus refers to a sale by CPAC, and not to leases entered into by it.
 
 
 42
 Finally, petitioners contend that the Commission's finding regarding Iowa Interstate's readiness to commence operations on October 10 was arbitrary. Br. of Joint Petitioners at 32. First, petitioners' challenge to the reliance on "unsworn representations of counsel" regarding Iowa Interstate's readiness is unavailing. The signature of an attorney constitutes verification of the facts contained in a pleading and obviates the need for an affidavit. 49 C.F.R. 1104.4 (1984). Accordingly, the statements regarding the new operator's ability to start up service immediately constitute record evidence in support of the Commission's finding.
 
 
 43
 Substantial evidence exists to support the agency's finding. The lease, tariffs, and car and interchange agreements were in place. Iowa Interstate Statement, Exhibits A and B (Oct. 18, 1984). Counsel averred that Iowa Interstate was able to operate immediately upon closing. Iowa Interstate Statement, p. 5 (Sept. 18, 1984); Iowa Interstate Statement, pp. 3-5 (Oct. 18, 1984). Finally, the new operator actually operated a car on the line on October 14, 1984. Iowa Interstate Statement, p. 4 n. 2 (October 16, 1984). This Court rejects petitioners' invitation to reweigh the evidence. See Ralston Purina Co. v. Louisville & Nashville Railroad, 426 U.S. 476, 477-78, 96 S.Ct. 2160, 2161, 48 L.Ed.2d 781 (1976).
 
 IV.
 
 44
 Intervenor UTU claims that because Iowa Interstate's proposal included a provision for trackage rights over a segment of the lines at issue, specifically, the 98.5 mile segment between Bureau and Blue Island, Illinois, the transactions properly fall under 49 U.S.C. Sec. 11343 ("section 11343"), not 49 U.S.C. Sec. 10901 ("section 10901"). If this is the case, the imposition of labor protective conditions is mandatory. Because the proposed overhead trackage rights operations are merely part of a single new integrated operating proposal made by a noncarrier, the Commission properly determined that the discretionary labor protective provisions of section 10901 apply.[15] Furthermore, the Commission reasonably determined that imposition of labor conditions was unnecessary.
 
 
 45
 The I.C.C. has long distinguished between non-carrier acquisitions and other purchase transactions that involve two or more existing rail carriers. Application Proc. Construc., Acq. or Opr. R. Lines, 365 I.C.C. 516, 518 (1982) ("Application Proc."); Okmulgee Northern Ry. Co. Abandonment, 320 I.C.C. 637, 638-39 (1964) ("Okmulgee"); Iowa Term. R. Co. Acquisition and Operation, 312 I.C.C. 546, 548 (1961). It is well settled that the acquisition of a railroad, even an active line, by a non-carrier, including a newly-formed entity organized for the purpose of providing interstate common carrier service, is governed by the requirements of 49 U.S.C. Sec. 10901, and not by 49 U.S.C. Sec. 11343. See, e.g., Black v. ICC, 762 F.2d 106, 111 (D.C.Cir.1985); Durango & S.N.G.R. Co.--Acquisition Operation, 365 I.C.C. 292, 295 (1979), aff'd sub. nom. RLEA v. United States, 697 F.2d 285 (10th Cir.1983).[16] On the other hand, the acquisition of an active rail line by an existing carrier is governed by section 11343, which the ICC has found to be analytically more appropriate for dealing with the unification of existing railroad facilities. Application Proc., 365 I.C.C. at 518.
 
 
 46
 Section 10901 and its predecessor are directed at the transportation-oriented activities of a single rail carrier or non-carrier applicants where there is little danger of any adverse competitive consequences. In contrast, the focus in section 11343 proceedings is on the potential anticompetitive impact of multi-carrier transactions. Id.; Matter of Chicago, M., St. P. & Pac. R. Co., 658 F.2d 1149, 1169 (7th Cir.1981) cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); Okmulgee, 320 I.C.C. at 638-40 (1964). Section "11343 is plainly concerned not with new, non-carrier entities entering the railway market through limited acquisitions such as the one at issue here, but with transactions integrating two or more carriers with the effect of multi-carrier transactions on competition." Black v. ICC, 762 F.2d at 115.
 
 
 47
 Iowa Interstate is a new non-carrier entering the railway market. In a single integrated proposal, Iowa Interstate seeks to operate the former Rock Island line from Council Bluffs, Iowa to Blue Island, Illinois. Only the Bureau to Blue Island, Illinois segment will be operated pursuant to overhead trackage rights in order to allow Iowa Interstate to reach the Chicago area. CPAC reserved these overhead rights when it gave the Baltimore & Ohio Railroad a 99-year lease on the line in order to preserve the integrity and future viability of the former Rock Island's Omaha-Chicago operation. These rights were assigned to Iowa Interstate by way of the CPAC-Heartland agreement. See Petition Exhibit C, pp. 8-9.
 
 
 48
 It is UTU's view that, although Iowa Interstate is clearly a non-carrier, it must be considered a carrier with regard to that part of the transaction in which it acquired rights to conduct overhead operations from Bureau to Blue Island. See Br. of UTU at 10-12. The Commission held that because Iowa Interstate is a non-carrier, and because the overhead operations are part of a single new integrated operating proposal made by a non-carrier, section 11343 is simply inapposite to the case at hand. Decision, F.D. No. 30554, at 5. We agree that section 11343 by its terms involves transactions integrating two or more existing carriers.
 
 
 49
 Intervenor UTU cites two cases, North Western Employees--Pur.--Chicago & N.W. Ry. Co., 342 I.C.C. 58 (1972) ("North Western") and Newrail Co., Inc.--Pur.--Western Pac. R. Co., 354 I.C.C. 885 (1979) ("Newrail"), for the proposition that the Commission has "long recognized" that trackage rights come under section 11343. Br. of UTU at 10-11. The Seventh Circuit, in People of State of Illinois v. United States, 604 F.2d 519 (7th Cir.1979), cert. denied, 455 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980) ("State of Illinois"), rejected petitioners' similar reliance on these two cases. That court held that the Commission properly handled the acquisition of rail properties by a new entity, including trackage rights, entirely under the predecessor provision of section 10901 rather than under the predecessor of section 11343. Id. at 525-27. As the Seventh Circuit noted, each case involved the purchase by a newly-formed corporation of all the rail-related assets of a carrier, including many miles of joint ownership of lines, operating authorities, leases, and contracts to operate the properties, including terminals, of other carriers. Id. at 525. Furthermore, in both cases, the acquisition involved a parent corporation and its subsidiaries, so that property of more than one carrier was being acquired. Id. at 526 n. 18.
 
 
 50
 The Seventh Circuit distinguished North Western and Newrail from the case before it. First, while both North Western and Newrail involved the acquisition of huge interstate rail systems with complex facilities-sharing arrangements with a number of different carriers, the case before the Seventh Circuit involved the acquisition of a line which happened to include incidental trackage rights. This "de minimis involvement" did not compel proceeding under section 11343 in what was otherwise a section 10901 case.
 
 
 51
 We find that the instant case similarly involves a straightforward acquisition of a small portion of a previously existing system by a non-carrier. The inclusion of trackage rights required to make the portion acquired economically viable is more in the nature of incidental authority, and not of a complexity involving many different carriers as was the case in North Western and Newrail.
 
 
 52
 The State of Illinois court stated that the Commission's decision to proceed under section 10901 was "fully consistent" with the rationale that section 10901 applies to single applicants, whereas the focus in section 11343 proceedings "is on the potential competitive effect of multi-carrier transactions." Id. at 526.[17] Similarly, the case at bar presents none of the competitive problems of multi-carrier transactions that is the focus of section 11343 proceedings. The Seventh Circuit's rationale concerning uncomplicated incidental overhead rights being included in a proposal involving a single new applicant applies with equal force here.
 
 
 53
 Finally, UTU argues that the Commission erred in not exercising its discretion to impose labor protective conditions. Br. of UTU at 16. That is, the ICC erred in promoting a new entity "in substitution of major established rail carriers" and that, therefore, the Commission's refusal to impose labor protective conditions in this case was improper.
 
 
 54
 In keeping with its broad discretion under section 10901, the Commission properly declined to impose labor conditions. In the absence of evidence justifying the need for labor protection, the ICC will not impose such conditions. In re Chicago, M. St. Pac. & P.R. Co., 658 F.2d at 1169; Railway Labor Executives, 697 F.2d at 286. The Commission has a longstanding and judicially approved policy of not imposing the costs of labor protection on fledgling rail operators that seek to continue service over lines that were subject to abandonment. See Black v. ICC, 762 F.2d at 116-17; Simmons, 697 F.2d at 336-37. For, "although individual employees are the primary beneficiaries of this [job protection] policy, their interests are secondary to promoting the welfare of the national transportation system." Simmons, 697 F.2d at 335.
 
 
 55
 We are satisfied that the Commission could rationally conclude from the entire record that circumstances did not require the imposition of labor protective conditions in this case. The Commission was aware that Iowa Interstate stated it would hire the vast majority of IRC personnel who filed applications for jobs, and that it intended to employ former Milwaukee and Rock Island employees. Decision, F.D. 30554, at 7. Consistent with its well-established policy, the Commission properly refused to impose the protection measures on the new carrier, finding the burdens on new operators were great enough without the additional cost of labor protection. Id.
 
 
 56
 Since the Commission approved the new carrier's operating rights under a section of the Interstate Commerce Act that makes labor-protective conditions discretionary at best, the UTU's contention that the ICC should have provided labor-protective conditions cannot be sustained.
 
 V.
 
 57
 For the foregoing reasons, the decision of the Commission is
 
 
 58
 Affirmed.
 
 
 
 [1]
 The segment of the line at issue in this case begins in Council Bluffs, Iowa, on the Nebraska border, and continues east through Des Moines, Davenport, and Blue Island, Illinois on into Chicago
 
 
 [2]
 Iowa Interstate had previously applied for and received a permanent exemption pursuant to section 10505 to operate the line. See Decision, F.D. No. 30554
 
 
 [3]
 Heartland and Iowa Interstate subsequently moved to dissolve the Iowa court's injunction. The Iowa court denied those motions on October 17, 1984 and continued the matter for the purpose of allowing the parties to seek direction from the ICC concerning the transition of operations on the line. Associated General Contractors, transcript of hearing at 1091 (Oct. 15, 1984) (enclosure to Letter of Milwaukee Trustee, F.D. No. 30489 (filed Oct. 19, 1984))
 
 
 [4]
 Title 49 U.S.C. Sec. 10505(a) (1982) (formerly 49 U.S.C. Sec. 12(1)(b) (1976 ed.)) provides, in its entirety, that:
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle--
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of the market power.
 
 
 [5]
 Indicative of the financial plight of the rail industry was the increasing number of branch lines being abandoned by rail carriers. For 1978, 1979, and 1980, carriers filed petitions to abandon 3,379, 4,421, and 4,784 miles of track, respectively. See 92d Annual Report of the Interstate Commerce Commission 33 (1978); 93rd Annual Report of the Interstate Commerce Commission 41 (1979); 94th Annual Report of the Interstate Commerce Commission 39 (1980)
 
 
 [6]
 See S.REP. No. 499, 94th Cong., 1st Sess. 53 (1975); H.R.REP. No. 725, 94th Cong., 1st Sess. 75 (1975), U.S.Code Cong. & Admin.News 1976, p. 14. The provision granting the Commission exemptive powers, originally Sec. 12(1)(b) of the Interstate Commerce Act ("ICA"), Ch. 104, 24 Stat. 379 (1887), was recodified in 1978 as 49 U.S.C. Sec. 10505 by Pub.L. No. 95-473, Sec. 1, 92 Stat. 1361. No substantive changes were made by the recodification
 
 
 [7]
 H.R.REP. No. 1035, 96th Cong., 2d Sess. 125 (1975) (report of the Conference.)
 
 
 [8]
 Accordingly, the Commission adopted procedures in Notices, ICC Ex Parte No. 400, Modification of Procedure for Handling Exemptions Filed Under 49 U.S.C. 10505, 45 Fed.Reg. 85,180 (Dec. 24, 1980), clarified 46 Fed.Reg. 7505 (Jan. 23, 1981) [hereinafter cited as "Ex Parte No. 400"], that eliminated the initial notice and comment procedure in most cases
 The ICC also stated that while the 30-day effective date of an exemption decision will be used in most cases, it may determine, in "unusual" or "extraordinary" circumstances, that a particular exemption should be granted immediately.
 
 
 [9]
 The Commission explained its elimination in Ex Parte No. 400 of the then-current notice and comment period:
 There is no hearing requirement for exemption requests. In fact, the Staggers Act has no[w] eliminated even the requirement for a "proceeding" in a section 10505 action. Our procedures therefore are intended to be informal. Our new procedures do not deprive any interested person of an opportunity to comment on exemption requests. It does, however, substantially reduce the time for processing cases since the Commission's decision goes into effect automatically....
 
 
 [45]
 Fed.Reg. 85,180
 
 
 [10]
 See discussion in footnotes 8 and 9, supra
 
 
 [11]
 Iowa Interstate asserts that petitioner's "transition period" claim raises a serious question as to mootness. See Br. of Iowa Interstate at 27-32. We do not pass upon such a contention since we find the ICC's interpretation to be a reasonable one, entitled to deference. This Court, as are all federal courts, is obligated to refrain from passing upon constitutional issues when unnecessary to do so. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)
 
 
 [12]
 See 49 C.F.R. Secs. 1150.5, 1150.6 (1984) (requiring submission of an operating plan and financial data for applications for operating authority under section 10901); 49 C.F.R. Part 1175 (1984), ICC Form OP-F-200 (1979) (requiring submission of a detailed statement of purpose and of financial data for applications for issuance of securities or assumption of obligations in regard to securities under section 11301)
 
 
 [13]
 The only financial data that an applicant for exemption under section 10505 is required to submit is a description of the purpose of the transaction as proposed. See 49 C.F.R. Secs. 1180.4(g)(2), 1180.6(a)(1)(i)-(iii), (a)(5)-(6), and (a)(7)(ii) (1984). The Commission has held that detailed scrutiny of financing, costs, and projected income is not required. See Decision, F.D. No. 30554, at 4-6 (served Oct. 1, 1984)
 
 
 [14]
 See S.REP. No. 614, 96th Cong., 2d Sess. 2 (pending bids for purchase of the Rock Island line, "[t]his provision is intended to provide a transition to operations by other carriers as purchase arrangements are completed"), and 3 ("[T]emporary operating authority ... would provide, without additional governmental expense, the interim service necessary until transfers are completed") (1980)
 
 
 [15]
 Unlike transactions under 49 U.S.C. Sec. 11343, where imposition of labor protective conditions is mandatory, the decision whether to impose such conditions on the acquiring entity in any transaction under 49 U.S.C. Sec. 10901 falls within the Commission's discretionary authority. See 49 U.S.C. Sec. 10901(c)(1)(A)(ii); Interstate Commerce Commission v. Railway Labor Executives Ass'n, 315 U.S. 373, 379-80, 62 S.Ct. 717, 721, 86 L.Ed. 904 (1942); Black v. ICC, 762 F.2d at 111; Simmons, 697 F.2d at 340; Railway Labor Executives' Ass'n v. United States, 697 F.2d 285, 286 (10th Cir.1983) ("Railway Labor Executives ")
 Title 49 U.S.C. Sec. 11343 (1982) (formerly 49 U.S.C. Sec. 5(2)(a), (5), (6), (7), (11), (14) (1976 ed.)) provides, in pertinent part, that:
 (a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under ... chapter 105 of this title may be carried out only with the approval and authorization of the Commission:
 (1) consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.
 (2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.
 (3) acquisition of control of a carrier by any number of carriers.
 (4) acquisition of control of at least 2 carriers by a person that is not a carrier.
 (5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.
 (6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.
 Title 49 U.S.C. Sec. 10901(c) (formerly 49 U.S.C. Sec. 1(18)(a), (b) (1976 ed.)) provides, in pertinent part, that:
 (1) If the Commission--
 (A) finds public convenience and necessity, it may--
 (i) approve the application as filed; or
 (ii) approve the application with modifications and require compliance with conditions the Commission finds necessary in the public interest; or
 (B) fails to find public convenience and necessity, it may deny the application.
 (2) On approval, the Commission has issue to the rail carrier a certificate describing the ... acquisition ... and operation approved by the Commission.
 
 
 [16]
 As far back as 1928, the Supreme Court recognized that the predecessor provision of section 10901 (section 1(18)) is applicable to obtain initial interstate operating authority by a non-carrier like Iowa Interstate. Texas & N.O. Ry. Co. v. Northside B. Ry., 276 U.S. 475, 479, 48 S.Ct. 361, 362, 72 L.Ed. 661 (1928), cited in People of State of Ill. v. United States, 604 F.2d 519, 524 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980)
 
 
 [17]
 The court elaborated:
 The potentially anti-competitive impact of the acquisition of ownership rights in key facilities to which other carriers need access is obvious. In both the North Western and Newrail cases the Commission, acting under Section [11343], imposed appropriate conditions to preserve routes, gateways and other traffic and operating relationships involving other carriers. Of course, there is no occasion for any such concern in the present case, and therefore no need to assume Section [11343] jurisdiction.
 State of Illinois, 604 F.2d at 526.