See also 130 B.R. 521.

In the MATTER of CHICAGO, MILWAU-KEE, ST. PAUL AND PACIFIC RAIL-ROAD COMPANY, Debtor.

In the Matter of ADMINISTRATIVE CLAIM OF IOWA INTERSTATE RAILROAD, LTD.

No. 77 B 8999.

United States District Court, N.D. Illinois, E.D.

Jan. 29, 1992.

Daniel R. Murray, Jenner & Block, Chicago, Ill., for Chicago Milwaukee Corp.

Stephen C. Bruner, Philip L. Harris and Kyle L. Harvey, Winston & Strawn, Chicago, Ill., for Iowa Interstate Railroad, Ltd.

### MEMORANDUM AND ORDER

LINDBERG, District Judge.

#### I. *Background*

This dispute involves a 54–mile segment of rail track connecting Davenport and Iowa City, Iowa ("Iowa City line"). On October 10, 1984, Heartland Rail Corporation ("Heartland") acquired the 54–mile Iowa City line. With the purchase of the Iowa City line, Heartland also acquired 500 additional miles of rail line to the east and west of the Iowa City line. Heartland subsequently leased the Iowa City line and the additional 500 rail miles to a new railroad

company formed in May of 1984 known as Iowa Interstate Railroad, Ltd. ("Iowa Interstate"). With the close of Heartland's deal on October 10, 1984, Iowa Interstate was authorized by the Interstate Commerce Commission ("ICC") to begin its operation of the Iowa City line.

Prior to the Iowa Interstate transfer, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Milwaukee Road") leased and operated the Iowa City line. However, Milwaukee Road did not vacate the Iowa City line on October 10, 1984. Milwaukee Road instead unsuccessfully petitioned the ICC for a thirty-day transition period in which to vacate the line. On October 30, 1984, the ICC held that Milwaukee Road's authority to operate the Iowa City line had expired on October 10, 1984. The ICC also denied Milwaukee Road's request for a thirty-day transition period.[1] Milwaukee Road subsequently vacated the Iowa City line on November 2, 1984 and later that same day Iowa Interstate began operating the line.

On April 9, 1985, plaintiff Iowa Interstate filed suit in the Milwaukee Road reorganization proceedings against defendant Chicago Milwaukee Corporation ("CMC").[2] In its complaint, Iowa Interstate alleges that Milwaukee Road, CMC's predecessor in interest, wrongfully operated the Iowa City line for twenty-three days without operating authority in violation of Section 10901 of the Interstate Commerce Act. On August 10, 1988, Judge Prentice Marshall ruled that CMC violated 49 U.S.C. § 10901 and that Iowa Interstate was entitled to damages under 49 U.S.C. § 11705. (See Order No. 969 at 15).

The parties have filed cross-motions for summary judgment as to the measure of damages applicable to Iowa Interstate's claim. For the following reasons, Iowa Interstate's motion for summary judgment is granted and CMC's motion for summary judgment is denied.

## II. *Discussion*

■ Section 11705(b)(2) of the Interstate Commerce Act (the "Act"), which addresses the damages issue, provides:

> A common carrier providing transportation subject to the jurisdiction of the Commission ... is **liable for damages sustained by a person as a result of an act or omission** of that carrier in violation of this subtitle.

49 U.S.C. § 11705(b)(2) (emphasis added). The Supreme Court interpreted Section 11705(b)(2) in *Pennsylvania Railroad Co. v. International Coal Co.*, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). The Court held that the appropriate "measure of damages was the pecuniary loss inflicted on the plaintiff as the result" of the illegal conduct. *Id.* at 203, 33 S.Ct. at 898; See *Northwestern Oil Co. v. Socony–Vacuum Oil Co.*, 138 F.2d 967, 970 (7th Cir.1943). The *Pennsylvania Railroad* Court recognized that this general standard of actual pecuniary loss could be measured in several ways, such as a decrease in business, a loss of profits or expenses incurred. *Pennsylvania Railroad*, 230 U.S. at 203, 33 S.Ct. at 898.

Several subsequent courts addressing this section of the Act have focused primarily upon the plaintiff's lost net profits as the preferred means by which to measure pecuniary loss. See *Louisiana Railcar, Inc. v. Missouri Pacific Railroad*, 5 I.C.C.2d 542 (1989); *American Trading Corp. v. Seaboard Airline Railway Co.*, 201 I.C.C. 440 (1934); *Alexander King Stone Co. v. Chicago, Indianapolis & Louisville Railway Co.*, 171 I.C.C. 47 (1930).

Iowa Interstate argues that a more accurate measure of damages in this situation

---

**1.** This decision was upheld by the District of Columbia Court of Appeals in *CMC Real State Corp. v. ICC*, 807 F.2d 1025 (D.C.Cir.1986).

**2.** CMC, the named defendant in this dispute, has gone through various restructurings and reorganizations. CMC was the parent corporation of CMC Real Estate Corporation ("CMCRE"), the reorganized company emerging from the Mil-

waukee Road reorganization proceedings. On November 30, 1989, CMCRE was liquidated into CMC, with this court substituting CMC for CMCRE in this proceeding on April 2, 1990. On June 27, 1990, CMC's real estate assets and certain of its other assets and liabilities, including this claim, were transferred to Heartland Partners L.P. and CMC Heartland Partners.

is one based upon gross revenues. Gross revenues are the amount of revenues, determined by the applicable rates and divisions, Iowa Interstate would have received from October 10, 1984 to November 2, 1984 had Milwaukee Road vacated the Iowa City line. According to Iowa Interstate, the *Pennsylvania Railroad* Court endorsed the measure of damages which best reflected the actual loss suffered by the injured party. Since the Court offered several examples and did not expressly exclude the use of gross revenues, Iowa Interstate contends that *Pennsylvania Railroad* allows for considerable discretion in choosing the applicable measure of damages. While lost net profits are often employed to measure damages, Iowa Interstate argues that nothing in the *Pennsylvania Railroad* decision suggests that lost net profits are the exclusive, much less the fairest method.

In the railroad industry, gross revenues are determined by the applicable "rates and divisions." [3] "Rates" are the published tariffs (prices) shippers pay railroads for hauling their freight. "Divisions" are necessary when more than one railroad hauls the same freight; the railroads agree in advance as to how the price paid by the shipper will be divided among the railroads participating in the haul. These amounts are known in advance and accepted by rail carriers.

### A. Policy of the Interstate Commerce Act

Gross revenues are the means by which railroads traditionally have computed deprived revenue in analogous contexts. Section 11710 provides support for a gross revenues measure of damages in cases of misrouting or diversion of traffic. Section 11710 provides in part:

> When a carrier ... **diverts or delivers property to another carrier in violation of routing instructions in the bill of lading,** both of those carriers are jointly and severally liable to the carrier that was deprived of its rights to participate in hauling that property **for the total amount of the rate it would have re-**

ceived if it participated in hauling the property.

49 U.S.C. § 11710(a)(1) (emphasis added).

While this section applies to misrouting and diversion cases, it reflects Congress' position toward wrongful conduct by carriers. The legislative history of this section indicates a recognition of the lack of adequate remedy for injured carriers and a desire to make this section a penalty provision to stop or lessen this wrongful practice. See *Atchison, Topeka & Sante Fe Railway, Co. v. Blanchette,* 628 F.2d 1011, 1013 (7th Cir.1980). Section 11710 demonstrates a public policy to discourage diverting or misrouting by allowing the injured carrier to recover the "total amount" it would have received had it been allowed to haul its property. No deductions are made for costs or expenses; damages are instead measured by the full amount of the haul.

### B. AAR Rule 50

Railway Accounting Rule 50, followed by the American Association of Railroads of which CMC and Iowa Interstate are members, also computes deprived revenue in a similar fashion. Iowa Interstate claims that this voluntary rule establishes an industry custom which entitles it to gross revenues. Rule 50 provides in part:

> Claims for Deprived Revenue
>
> **B. Claims for deprived revenue shall be borne by the carrier or carriers responsible for the delivery of the shipment contrary to routing instructions in the bill of lading ...**
>
> **C. The carrier deprived of the line-haul shall be allowed the total amount of revenue at the applicable rate that it** would have received had the shipment not been diverted. **No adjustments shall be made for switching charges, car hire expenses or any other expenses.**

AAR Rule 50(B) and (C). Rule 50 provides that those who misroute or divert the haul of a carrier will be liable for the amount the injured carrier would have generated

---

**3.** Under the Interstate Commerce Act, tariffs define the gross revenue that carriers receive

for rail shipments. 49 U.S.C. § 10761.

by the haul, without any deduction for expenses. The amount is equivalent to the gross revenues the liable carrier generated during its unlawful operation.

This is no draconian measure imposed upon an unsuspecting and unwitting carrier. It is a voluntary rule created by carriers to foster dispute resolution. Rule 50 reflects the industry's recognition of the problem; further, it is an attempt to address the problem through self-regulation.

### C. Interstate Commerce Commission Letter

■ The ICC generally has concurrent jurisdiction with the United States District Courts over claims such as the instant one. 49 U.S.C. § 11705(c) and (d). But for the pendency of CMC's reorganization proceedings, Iowa Interstate's revenue claim could have been brought before the ICC. The parties therefore should not obtain a markedly different result concerning the measure of damages simply because this court, and not the ICC, decides this issue. While not binding as an ICC determination, the ICC letter does reflect support for a gross revenues measure of damages by those familiar in the area. The ICC letter provides as follows:

> [T]he Commission believes that the damages as imposed under 49 U.S.C. § 11710(a)(1) applicable to misrouting cases would be appropriate for the policy reasons that pertain to such cases. See *Atchison, T. & S.F. Ry. Co. v. Blanchette*, 628 F.2d 1011, 1013–14 (7th Cir. 1980).

The ICC letter recognizes that the policy reasons which support gross revenues as the measure of damages in misrouting cases apply in holdover situations. The policy is to remove all economic incentive for carriers to misroute or divert traffic. See *Atchison*, 628 F.2d at 1013–14. This policy interest is as strong or stronger in the case of holdover carriers who operate without ICC authority to the detriment of other carriers.

### D. Public Policy

The rationale for using gross revenues as a measure of damages in this case is compelled by the economics of the heavily regulated railroad industry. Gross revenues better reflect the economic benefit to Milwaukee Road; they also allow for recovery of fixed costs. Railroads, especially start-up ones, are burdened with immense fixed costs which seldom allow for profit. In industries where fixed costs are substantial, they may properly be an element of damages. See *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir.1980); *Distillers Distributing Corp. v. J.C. Millett Co.*, 310 F.2d 162 (9th Cir. 1962); *Avella Coal Co. v. Pittsburgh & West Virginia Railway Co.*, 77 I.C.C. 731, 736 (1923).

In this case, Iowa Interstate was a start-up railroad. The fact that so many railroads, especially start-up railroads, fail to make a profit ensures an injured railroad's inability to be made whole under a lost net profits measure of damages. Such a result vitiates the remedy afforded under Section 11705(b)(2). If a holdover railroad such as Milwaukee Road knew it would be liable only for lost net profits, which a start-up railroad could not yet generate, no incentive would exist for it to vacate the line promptly. The use of a lost net profits standard would therefore encourage holding over and promote litigation, rather than adherence to regulatory authority. Using gross revenues as the measure of damages discourages holding over and makes the injured rail carrier whole by compensating it for the revenue wrongfully diverted by the holdover carrier.

ORDERED: Iowa Interstate's motion for summary judgment as to the measure of damages applicable to Iowa Interstate's revenue claim is granted. CMC's cross-motion for summary judgment is denied.